[No. 1784-2.    Division Two.    December 21, 1976.]

PLYWOOD MARKETING ASSOCIATES, *Appellant*, v. ASTORIA PLYWOOD CORPORATION, *Respondent.*

*John L. LaLonde* and *Boettcher, LaLonde, Kleweno, Lodge, Ladley, Witteman, Schrieber & Kelly* (*Edwin J. Peterson* and *Tooze, Kerr, Peterson, Marshall & Shenker,* of counsel), for appellant.

*James F. McAteer* and *Lenihan, Ivers, Jensen & McAteer,* for respondent.

PETRIE, C.J.—During the first 4 years of its existence, Plywood Marketing Associates, a plywood sales coopera-

tive, made tentative advances to its members totaling $70,583,316. During the same period, its net margins totaled only $69,951,689. A dispute arose as to how the resulting "loss" of $631,627 should be absorbed.

PMA sued a member who had withdrawn from the cooperative, Astoria Plywood Corporation, to recover claimed "over-advances" to Astoria totaling $71,739 together with interest thereon from October 31, 1970, the last date of PMA's fourth fiscal year and also the effective date of Astoria's withdrawal from PMA. PMA contended that all its "losses," including those which developed from unprofitable sales of nonmember products, should be charged to its members and allocated among them on the basis of their respective percentages of participation on a total dollar volume over the entire 4-year period. Astoria defended on the theories (1) that PMA's losses attributable to financially unsuccessful dealings with products of nonmembers should not be charged to the members; (2) that an accord and satisfaction had previously been reached between PMA and Astoria as to all losses which had occurred in the 3-year period ending October 31, 1969; and (3) that no losses should be allocated against Astoria in excess of its fiscal year 1970 percentage of patronage.

The trial court held that nonmember transaction losses were chargeable to the members and that PMA and Astoria had reached an accord and satisfaction as to all losses resulting from the first 3 years of operation but, nevertheless, assessed Astoria with a portion of subsequently discovered pre-1970 losses, as well as its share of 1970 losses, all based on Astoria's 1970 percentage of patronage. The trial court denied PMA's prayer for prejudgment interest. Both parties have appealed to this court.

We hold:

1. Under the circumstances of PMA's method of operation, losses resulting from financially unsuccessful transactions with products of nonmembers are chargeable to members.

2. An accord and satisfaction was reached after the close

of fiscal year 1969 only as to a method of allocating all the 3-year losses then known to PMA's board of directors, in the amount of $167,099. Under that method of allocation, Astoria was assessed (and paid back) $33,287.

3. Because PMA's General Manager, Fritz Page, had engaged in certain marketing activities without board approval, had falsely prepared certain invoices, and had concealed these activities from the board until fiscal year 1970, additional losses actually were incurred prior to 1970, but were not discovered until 1970. The corrected amount of pre-1970 losses totaled $390,949 (including the $167,099 for which an accord and satisfaction had been reached). These losses should be allocated among the members on the basis of each member's 3-year percentage of patronage. During that 3-year period, Astoria's percentage of patronage on a dollar basis was 19.921 percent. Accordingly, Astoria should be assessed a total of $77,881 for pre-1970 losses, from which should be deducted the previously allocated and paid assessment of $33,287 and an acknowledged additional credit of $3,787.

4. PMA's fiscal year 1970 losses totaled $240,678. In that year Astoria's percentage of patronage dropped to 5.986 percent. Accordingly, Astoria should be assessed a total of $14,407 for 1970 losses.

5. PMA acknowledges the validity of that portion of the trial court's judgment which awarded Astoria the amount of $5,000 for return of its membership fee together with prejudgment interest thereon from September 27, 1970.

6. Judgment against Astoria should be modified to award PMA the amount of $55,214 together with interest thereon at the prejudgment rate of interest from June 11, 1971, the date upon which PMA made demand upon Astoria.

For a more understandable explanation of our conclusions, we must relate some of PMA's history and operations.

Nine manufacturers of plywood and other wood products formed PMA in 1966 as an Oregon cooperative corporation to market their products. Each member mill was repre-

sented on PMA's board of directors after paying a membership fee of $5,000 and an assessment of $3,000 to cover PMA's start-up costs. Article 7, section 2 of the bylaws provides that the "cooperative shall do business for or with its members on a nonprofit cooperative basis." PMA was authorized to, and did, function by taking title to members' products, selling them, and collecting the proceeds. The board was authorized, however, to establish so-called marketing "pools," with the "net savings" derived from the sale of products in each pool to be credited to the participating members on a pro rata basis. In addition, article 7, section 7 of the bylaws provided for distributive charging of losses in the following manner:

> If the cooperative *during a fiscal period or pool period shall sustain a loss on any pool, such loss shall be charged to the members having interests in that pool, . . . or in some other proper manner,* in accordance with sound cooperative accounting practice . . . *If in any fiscal year the cooperative shall incur a net operating loss* which is recognizable for tax purposes, the board of directors shall have authority to *charge off such loss either against net margins of future years* or against capital credits *or in such other manner* as will afford the cooperative the maximum benefit for tax purposes. .

(Italics ours.)

PMA was authorized to make advance payments to any member in anticipation of the receipt of proceeds from the sale of that member's products, subject to "adjustment and settlement as at the close of the applicable fiscal year or pool period." "Net margins," or profits, were to be apportioned as described in article 7, section 9 of the bylaws:

> (a) *The cooperative shall deduct and retain from the sums received by it from its sales of members' products or from other services rendered for its members,* on a pool or other basis as provided in section 7 of this article, *any sums advanced or paid by the cooperative on the products involved,* any cost incurred by the cooperative on the goods sold, and the cost of the cooperative's operations and services and of maintaining the cooperative, together with reasonable charges for appropriate valuation reserves, *and any losses incurred.* The net balance

. . . shall be apportioned among the members for or to whom such services were rendered, prorata according to the patronage of the cooperative by those members during the period involved. Such apportionment among members shall be based upon the dollar value of the products handled and other services rendered by the cooperative . . .

(Italics ours.)

The bylaws further provide that acceptance of membership in PMA constitutes an agreement to abide by its articles, bylaws, and regulations. A member could file a written withdrawal effective only as of the anniversary of its election to membership. An annual audit was required following the close of each fiscal year, which the board established at October 31.

PMA bylaws and operations are subject to the Oregon Cooperative Corporation Act, ORS ch. 62, which the parties agree is controlling. ORS 62.415 provides as follows:

Apportionment and distribution of net proceeds or savings or net losses. (1) The net proceeds or savings of a cooperative shall be apportioned, distributed and paid periodically to those persons entitled to receive them, at such times and in such reasonable manner as the bylaws shall provide; except that net proceeds or savings on patronage of the cooperative by its members shall be apportioned and distributed among those members in accordance with the ratio which each member's patronage during the period involved bears to total patronage by all members during that period. *The bylaws may contain any reasonable provisions for the apportionment and charging of net losses.*

. . .

(5) . . . *net losses shall be computed in accordance with generally accepted accounting principles applicable to cooperative corporations,* . . .

(Italics ours.)

At the formation of PMA in November 1966, the attorney for PMA advised each member, including Astoria, as to the sharing of potential losses:

A *member* which patronizes the organization by marketing products through it or otherwise using its services

*can be liable* to the organization for that member's pro-rata share of any loss suffered by the marketing coopera-tive on products handled by it for that member or *for that member's prorata share of any general operating loss of the marketing cooperative.* Such share would be in direct proportion to the amount of business done by that member with the cooperative; hence the member would not share any such losses unless it had in some way patronized or used the cooperative during the period involved.

. . .

There is no statutory authority, nor any authority under the present articles of incorporation and bylaws of the marketing cooperative, for levy of any assessment against a member independently of the member's share of any loss suffered on any marketing transaction or other business done by the cooperative for that member.

(Italics ours.)

PMA's initial operating practice was to obtain customer orders and solicit plywood from member mills, who shipped directly to the customer. PMA was allowed succes-sive trade discounts by the members of 5 percent, 5 per-cent, and 2 percent for cash and took title to the plywood. Title passed to the customer upon payment to PMA of the market price, less successive trade discounts of 5 percent, 3 percent, and 2 percent. The 2 percent differential between the discount allowed the customer and that paid by PMA constituted the basis for the cooperative's potential profit intended for allocation to its members.

PMA also made purchases from nonmembers in an effort to round out its line and make its services more attractive to customers desiring products not produced by member mills. Nonmember business ranged from 17.65 percent of PMA purchases in the fiscal year ending October 31, 1967, down to 8.38 percent in the year ending October 31, 1969.

In the first year of operation, fiscal year 1967, PMA earned $1,042—although the members had not been repaid their $3,000 assessments. This slim profit was not distrib-uted to the members. In the fiscal year 1968, PMA actually lost $74,102, making a combined 2-year loss of $73,060. The

loss was not then assessed against the members, however, because when the audit report was received early in 1969, there was a profit in prospect for fiscal 1969. In anticipation of a profit to eradicate the 1968 loss, the board resolved to treat November 1, 1967, to October 31, 1969, as a "single operating pool," in the sense of a single fiscal period. However, PMA did not "pool" or commingle its members' products for sale in the manner often used by cooperatives to market their goods, and the trial court so found.

Early in 1969, PMA's method of operation changed so that members shipped inventory directly to PMA warehouses and billed PMA. At the same time, the market price of plywood fell abruptly, from $144 per thousand board feet in February to $70 per thousand in April 1969, where it stayed nearly all year. This meant that PMA would advance the member the agreed price, but if the goods sold for less in the depressed market, PMA would charge the difference in price back to the member whose product was sold and maintain its 2 percent margin on the sales price.

Besides the falling market, PMA was betrayed by its General Manager, Fritz Page. Mr. Page became general manager in July 1968, after PMA had been engaged in nonmember business for some time. He purchased a substantial quantity of lauan plywood from a nonmember when the price was high, without the knowledge or consent of the board of directors. As the market price fell, Mr. Page kept the lauan in storage, concealing its existence from the board. He prepared a bogus invoice showing the sale of 256,000 feet of the lauan for $74,752, so that the "proceeds" could be pledged to secure a bank loan to PMA. Without the board's knowledge, he made other purchases from nonmembers and sold products, contrary to PMA policy, to a customer which had lost its credit rating. Mr. Page did not profit personally from these surreptitious activities; his motivation was to paint an unrealistically rosy picture for the members so that PMA could ride out the drop in the market without losing members.

PMA's audit report for fiscal year 1969, prepared by its

accountant, Moss, Adams & Co., showed a net loss of $94,039 for the year and a total 3-year loss of $167,099. On January 15, 1970, the PMA board, unaware of Page's surreptitious concealments and accepting the auditor's advice pursuant to "sound accounting practice," voted to prorate the reported loss according to each member's percentage of patronage to date. Astoria's share was the largest, $33,287, which it accepted after arguing vainly for a per capita sharing of losses. Astoria stopped selling plywood to PMA and tendered its withdrawal in February 1970. The board accepted this on March 27,

> with the understanding that Astoria Plywood participation in the current pool [fiscal year 1970] continues by reason of its past deliveries to that pool until the closing of that pool on October 31, 1970.

Subsequently, Mr. Page's concealments were discovered and PMA employed another accounting firm, Knight, Vale & Gregory, to report on the true condition of its affairs as of the end of May 1970. The new audit report concluded that the initial report—having accepted Page's falsified records as valid—contained a tentative overstatement of net assets as of October 31, 1969, of $196,850, including an inventory overevaluation of $162,049.

PMA's financial statement for the 4 years ending October 31, 1970, prepared by Moss, Adams & Co., showed net margins of only $69,951,689, and yet member mills had received credits totaling $70,583,316. Over the 4-year period, Astoria had been paid $12,161,199. Making the basic assumption that all losses should have been absorbed on a percentage of patronage basis over the 4-year period, PMA calculated that Astoria should have been paid only $12,089,460 (recognizing the $33,287 assessment). PMA filed suit to recover the overpayment to Astoria of $71,739.

With this background, we first consider the court's finding of an account stated and accord and satisfaction. These concepts are based upon the law of contract. *Shell Oil Co. v. Livingston Fertilizer & Chem. Co.*, 9 Wn. App. 596, 513 P.2d 861 (1973); *Eagle Ins. Co. v. Albright*, 3 Wn.

App. 256, 474 P.2d 920 (1970). Simply stated, an accord is a contract between debtor and creditor for the settlement of a claim by some performance other than that which is due. Satisfaction occurs when the accord is performed. Restatement of Contracts § 417, comment *a*. (1932); 6 A. Corbin, *Contracts* § 1276 (1962). The new contract must rest upon consideration, and there must be a meeting of the minds upon the subject of the agreement and an intention by both parties to satisfy the prior obligation by performance of the new. *Meyer v. Strom*, 37 Wn.2d 818, 226 P.2d 218 (1951); *Lenchitsky v. H.J. Sandberg Co.*, 217 Ore. 483, 343 P.2d 523 (1959). An account stated is defined in Restatement of Contracts § 422 (1932), as follows:

> (1) Matured debts are discharged by a manifestation of assent in good faith by debtor and creditor to a stated sum as an accurate computation of the amount of the matured debt or debts due the creditor, or if there are cross demands as the amount of the difference between the total indebtedness due one party and the total indebtedness due the other party. A new duty arises to pay a sum so fixed.

Here again, the parties must mutually agree to settle their account by payment of a certain amount. *Shell Oil Co. v. Livingston Fertilizer & Chem. Co., supra.*

In this case, Astoria's payment of $33,287 as its pro rata share of the 1966-69 losses did not constitute an accord and satisfaction or account stated for the then *unknown* overstatement of assets on October 31, 1969, and other machinations of the general manager which were not discovered until 1970. Astoria yielded payment of $33,287 as its patronage share of known losses after fighting for a lower per capita share. The parties could not have mutually intended that their settlement of PMA's claim against Astoria would satisfy a debt whose existence had not yet been revealed. There was no meeting of the minds concerning the unknown loss, and neither party gave, nor could have given, consideration for settling Astoria's share of an obligation which had not yet matured. *Trompeter v. United Ins. Co.*, 51 Wn.2d 133, 316 P.2d 455 (1957). By assessment of the

$33,287, the parties simply resolved the manner of allocation of Astoria's share of the known losses; they did not thereby intend to settle an additional unliquidated or disputed amount, because they simply had no awareness of any other loss to be apportioned. *See Kibler v. Frank L. Garrett & Sons, Inc.*, 73 Wn.2d 523, 439 P.2d 416 (1968).

Defendant argues that knowledge of the true extent of the asset overvaluation must be imputed to PMA through its General Manager Page. Generally a corporate principal is chargeable with notice of facts known to its agent, except when the agent has not acted for or on behalf of the corporation, or has acted adversely to the principal in his own interest. *Hendricks v. Lake*, 12 Wn. App. 15, 528 P.2d 491 (1974); Restatement (Second) of Agency §§ 274, 279 (1958). Even if the agent conceals knowledge from his principal, contrary to its best interests, the knowledge will be imputed to the principal as against third parties if the agent is the sole representative or executive official of the principal. *Higgins v. Daniel*, 5 Wn.2d 134, 105 P.2d 24 (1940). Page had sincere intentions and he did not benefit personally by his mismanagement and falsification of PMA's records. Nevertheless, his actions were deceptive and financially damaging to the constituent cooperative membership of PMA, and as such were adverse to its interests. However, Page was not the sole representative of the cooperative to a third party; he reported to its board of directors on which Astoria was actively represented when the accord was reached. Under these circumstances, Page's knowledge of the concealed losses at the time Astoria was assessed for the known losses, should not be imputed to his principal, the PMA board. 3 M. Wolf, *Fletcher Cyclopedia Corporations* §§ 827, 827.1 (rev. ed. 1975).

Astoria contends, nevertheless, that PMA's acceptance of Astoria's withdrawal from membership and assessment of $33,287, estops PMA from charging Astoria for the subsequently discovered losses for fiscal year 1969. This appears to be a reiteration of the principle that a party who has entered into an agreement to compute and settle an

existing claim is precluded, by the account thus stated and subsequent satisfaction of the new agreement, from asserting the former claim. As we have pointed out, these doctrines do not pertain to a claim yet uncontemplated by the parties. In addition, the facts in the case at bench do not satisfy the elements of equitable estoppel, because PMA's original assessment of Astoria's share of the only loss then known to the parties was in no way inconsistent with or contrary to an attempt to charge Astoria a share of the later-discovered loss; nor did Astoria, by accepting a $33,287 share of the $167,099 loss and foregoing its position on the equal sharing of *that* loss, somehow rely on the settlement to change its position detrimentally regarding any additional, then unknown loss. *Hill v. L.W. Weidert Farms, Inc.*, 75 Wn.2d 871, 454 P.2d 220 (1969).

We turn next to the trial court's allocation of the 1969 asset overvaluation and the 1970 operating losses to PMA members based on their 1970 patronage share of business. Astoria contends that neither the Oregon statute nor the PMA bylaws authorize the cooperative to charge the members for losses, particularly those derived from sales of goods purchased from nonmembers. This begs the question of who would bear the losses if not the then active members, who are themselves the sole owners and ultimate managers of this cooperative. In addition, the bylaws provisions quoted above from article 7, sections 2 and 9 allow the cooperative to do business *"for or with* its members" and speak of sales of member products *or* "other services rendered for its members, . . ." (Italics ours.) Astoria was aware that PMA had openly purchased products from nonmembers virtually from the outset, and there is no record that the practice was over Astoria's objections. ORS 62.415(1) and (5) allow a cooperative's bylaws to "contain any reasonable provisions for the apportionment and charging of net losses" so long as net losses are computed in accordance with generally accepted accounting principles. Frank L. Bradley, a certified public accountant specializing in cooperative accounting, testified that cooperatives com-

monly engage in nonmember business, that, aside from tax accounting purposes, it was consistent with generally accepted accounting principles to lump losses from nonmember business with other losses in apportioning cooperative losses, and that the overvaluation of inventory *discovered* in 1970 could be properly apportioned to the prior period in which the false entries were made. Moreover, the allocation of losses was within the broad terms of article 7, section 7 of the bylaws allowing the charging of a fiscal period loss in such "proper manner" as comports with "sound cooperative accounting practice" and will "afford the cooperative the maximum benefit for tax purposes." We conclude that the charging of net losses to the members, including losses from nonmember business, was according to sound accounting principles and cooperative practice, was permitted by the statute, and was not precluded by PMA's bylaws which governed Astoria until its withdrawal became effective.

The truly equitable method of allocating the subsequently discovered 3-year losses is to distribute those losses in the same manner in which the previously known losses, by majority vote, had been allocated over the same fiscal period—by charging each member in accordance with its percentage of patronage during that period. Furthermore, for subsequent losses which were *incurred* in fiscal 1970, Astoria should not be charged in excess of its percentage of patronage during that year.

■ Finally, we consider the question of prejudgment interest to PMA. Such interest is allowable when the claim is liquidated or, if unliquidated, when the claim is based on a contractual obligation and the amount due is ascertainable by calculation without reliance on opinion or discretion. *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 273 P.2d 652 (1954); *see Public Market Co. v. Portland*, 171 Ore. 522, 138 P.2d 916 (1943). The court in *Mall Tool Co.* at pages 170, 176, adopted the definition of "liquidated" from C. McCormick, *Handbook on the Law of Damages* § 54, at 213 (1935):

A claim is liquidated if the evidence furnishes data

.which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate.

If the claim is one of the kinds mentioned above, it is still "liquidated," by what seems the preferable view, even though it is disputed in whole or in part.

In the case at bench, the very existence and the amount of Astoria's obligation were in dispute. However, there was no dispute as to the total amount of losses occasioned by member and nonmember transactions. Once the defenses of account stated and accord and satisfaction are overcome to allow PMA to assess Astoria its fair share of all 1970 and pre-1970 losses pursuant to the bylaws, and the precise and appropriate method of allocating those losses is determined, the amounts attributable to each fiscal period are readily calculable. PMA should be awarded statutory interest on its claim from the date of its demand for payment upon Astoria on June 11, 1971.

Judgment is modified as herein provided.

REED, J., and COCHRAN, J. Pro Tem., concur.

Petition for rehearing denied January 17, 1977.

Review denied by Supreme Court June 8, 1977.