[No. 4283-II.   Division Two.   April 17, 1981.]

PANORAMA RESIDENTIAL PROTECTIVE ASSOCIATION, ET AL, *Appellants,* v. PANORAMA CORPORATION OF WASHINGTON, *Respondent.*

*Robert A. Comfort,* for appellants.

*Louis D. Peterson,* for respondent.

REED, C.J.—Members of the Panorama Residential Protective Association, people who reside within the retirement community of Panorama City in Lacey, appeal from a summary judgment in their declaratory judgment action seeking to bar a rent surcharge intended by their landlord, the Panorama Corporation of Washington.

Plaintiffs have lived in Panorama City for varying lengths of time. They occupy their houses and apartments under lifetime leases that allow termination of tenancy, however, upon 90–days' written notice.[1] Periodic rent increases are determined, according to their leases, by reference to the Consumer Price Index (or "cost of living

---

[1]The 90-day notice requirement applies if a new tenant can be found for the unit; if the unit is not rerented, residents must wait 15 months before they may terminate their leases.

index"—apparently treated by the parties as the same thing). Those plaintiffs who began living in Panorama City before 1971 are subject to two kinds of rent–adjustment clauses. One kind provides for biennial adjustments to reflect changes in the Consumer Price Index (CPI).

*The sums due shall be adjusted by Panorama City, Inc. on the second anniversary of this Agreement and every two years thereafter* in proportion to the change up or down in the cost of living index of the United States Bureau of Labor.

(Italics ours.) Some 226 plaintiffs signed leases with essentially this clause. Another kind of rent adjustment clause pertaining to a few of the pre–1971 plaintiff residents provided for annual cost of living adjustments:

*The sums due shall be adjusted by Panorama Corporation on the first anniversary of this Agreement and every year thereafter* in proportion to the change up or down in the cost of living index of the United States Bureau of Labor.

(Italics ours.)

The trial court, in certifying class action status for the lawsuit, designated these two groups of tenants as "shall" plaintiffs, *i.e.*, those whose leases provide that their rent "shall" be adjusted with reference to the CPI.

In 1971—according to affidavits of the then–president and sales manager of the Panorama Corporation—the landlord faced the consequences of a recession in the local economy. There arose a severe slackening of interest in Panorama's rental units, and some residents moved out or threatened to do so because the low rents elsewhere in the area had made Panorama City's rates noncompetitive. As a result, on May 20, 1971, the president of Panorama Corporation sent a letter to all residents containing the following language:

Several weeks ago at our New Events Brunch, and on an individual basis, I discussed with you modifying our approach to assessing "cost of living" increases.

This matter was presented to Panorama Corporation's Board of Directors on April 28, 1971, and the decision

was reached that the "cost of living" would be based upon program cost only. Thus, from this date on, all "cost of living" adjustments will be made on this new basis.[2]

In the past, as you will recall, the "cost of living" increase was computed by increasing your previous monthly base charge by the percentage increase in the National Cost of Living Index.

. . .

For all "cost of living" increases effective March 1, 1971, and thereafter, through November 30, 1971, the actual program costs for the previous year ending November 30, 1970, will be used as the basis for computing the "cost of living" increase. The Board of Directors of Panorama City feel that this is the most equitable method to assess the "cost of living" increase, as it is based on the cost of program services only.

At some time shortly after this letter was sent, the landlord began using lease forms providing in part that the rents

may be adjusted by Panorama Corporation on the first annual anniversary of this Agreement and every year thereafter by an amount not to exceed the proportional increase or decrease in the Consumer Price Index . . .

or, in some cases, that the Panorama Corporation "shall have the right" to so adjust the rents. A total of 76 of the plaintiffs signed leases of these two similar kinds, and they were categorized for class action purposes as the "may" plaintiffs—those whose rent "may" be adjusted with reference to the CPI.

During the 7 years following the 1971 notice, on the anniversary date for each resident, the landlord computed

---

[2]The letter may be read to indicate the landlord intended to increase the rent according to the increase in program costs, rather than by applying the change in the CPI to program costs. The corporation followed the latter method, however, and the record contains no challenge to this interpretation of the letter.

the periodic rent increase on the "program cost" basis.[3] The rental increases for that period were generally less than they would have been had the CPI increase been applied to current rentals as anticipated under the lease.

In April of 1978, however, the corporation informed all residents as follows:

> During the time you have been a resident of Panorama City, inflation has been one of the major problems for our country, for you as an individual, and for Panorama City.
>
> Over the years we have tried to hold the line by not assessing you the total increase on your monthly charge that is called for in your residency agreement. . . .
>
> We now find it necessary to bring your monthly charge up to the full amount agreed to in your contract. Your increase is $     per month and your new gross monthly charge will be $     per month.
>
> This procedure will not alter your regular anniversary date. The change merely brings your monthly charge up to what it would have been at the time you received your last increase, had you been charged at the rate specified in the contract.
>
> . . .
>
> Your May billing will reflect this new cost. . . .

The corporation was not seeking to recapture the rent it could have collected during this 7–year period. Rather, it imposed a onetime surcharge, the effect of which was to bring the monthly charges to the level they would have been had they been computed under the residency agreements over the 7–year period.

A typical example in the record will illustrate the point. One of the residents whose rent was $300.50 in 1971, was paying rent of $438.10 in 1978 due to periodic increases under the "program cost" adjustment plan followed during that period. According to defendant's calculations, the resident would have been paying rent of $496.46 had the cost of living increase been computed during that time with ref-

---

[3]The "program cost" was apparently related, at least at first, to the actual cost of general operations and maintenance at Panorama City. Defendant provides its residents with comprehensive services including medical and nursing care.

erence to the current rent. Therefore, the resident was billed a nonanniversary increase in rent of $58.36 to make up the difference, and the new figure of $496.46 was intended to become the base upon which future increases would be computed.

In their class action plaintiffs sought declaratory and injunctive relief preventing a return to rentals computed in accordance with the original formula. After a series of summary judgment motions, the trial court ruled as follows:

1. The one–time, nonanniversary rental increase announced in April, 1978 was valid as to the two classes of "shall" plaintiffs and was not barred by plaintiffs' theories of waiver, promissory estoppel, laches, accord and satisfaction, account stated, modification of contract, or statutes of limitations;

2. The one–time rental increase was invalid as to the two classes of "may" plaintiffs, and the Panorama Corporation was enjoined from collecting or retaining any rental increases from them except on their lease anniversary dates and then only to the extent of the proportional increase in the CPI applied to the then monthly charge;

3. The issue remaining for trial is whether defendant is estopped from imposing the 1978 rental surcharge because the "termination costs"—the amount a tenant may be obligated to pay for at least 90 days after giving notice of termination, and for as long as another 12 months or until the unit is relet—were in effect increased by the surcharge; this issue is to be litigated by each "shall" plaintiff on an individual basis and not as a class action.

The "shall" plaintiffs—those residents whose leases provide that their rents "shall" be adjusted annually or biennially pursuant to changes in the CPI—have appealed the summary judgment against their class action to prevent the 1978 rental increase. The defendant has cross–appealed from the court's retention for trial of the issue of promis-

sory estoppel because of increased termination costs.[4]

Plaintiffs contend that the phrase in their lease agreements providing that the rents "shall be adjusted" on the anniversary dates is permissive, rather than mandatory. They then argue that some or all of a variety of legal and equitable doctrines bar the imposition of the 1978 increase: modification of the lease by the 1971 change in method of computing rent increases; laches; waiver; account stated; accord and satisfaction; statute of limitations and estoppel. Although we are sympathetic to the plaintiffs' situation, we conclude that established principles of contract law require affirmance of the judgment in this case on all issues raised by the parties.

Plaintiffs argue at length that "shall" in the cost of living adjustment provision should be construed as permissive rather than mandatory. They reason that a permissive construction would equate these provisions with those in the "may" leases, on which the trial judge ruled in their favor. Plaintiffs, however, pose an illusory dichotomy. The language in the two types of leases is different. Unlike the "may" leases, the agreements before us require that the potential rent rise and fall with changes in the cost of living. We have no doubt that, in the admittedly unlikely event of a decline in the cost of living, plaintiffs would argue at equal length for a mandatory construction of the adjustment provision. In essence, these leases provide for automatic adjustments in the rent paralleling the cost of living curve. The only action required of the lessor on an anniversary date is a mathematical computation for purposes of billing the tenants at the adjusted figure.

Plaintiffs argue that, by electing not to enforce the formula, defendant permanently modified their leases and should therefore not be permitted to impose the 1978 surcharge. The issues raised by this assertion revolve around

---

[4]The Panorama Corporation also cross-appealed from the summary judgment in favor of the "may" plaintiffs, but has abandoned that aspect of the cross appeal.

the real question in this case: whether the landlord's election not to charge the maximum potential rent during that 7-year period now bars it from imposing a onetime surcharge to bring the rents up to the levels authorized by the lease. While plaintiffs in their brief on appeal urge that the corporation's actions resulted in a permanent modification of the leases, a number of their affidavits assert there was no modification in the original lease. We agree.

■ Although defendant's letter and subsequent billings arguably satisfy the requirement that the modification be in writing, they are not acknowledged as required by the statute of frauds, RCW 59.04.010. In Washington, parol agreements to modify written leases are enforceable only to the extent they have become executed. *Corson Corp. v. Frontier, Inc.,* 55 Wn.2d 652, 349 P.2d 424 (1960). Such agreements, insofar as they are executed, do not require a new consideration. *Conlan v. Spokane Hardware Co.,* 117 Wash. 378, 201 P. 26 (1921). However, if the agreement lacks consideration or violates the statute of frauds, it is unenforceable insofar as it remains executory. As stated in *City Mortgage Co. v. Diller,* 180 Wash. 499, 503, 40 P.2d 164 (1935), quoting from *Sinnige v. Oswald,* 170 Cal. 55, 148 P. 203 (1915):

> "The finding that there was no change in the terms of the lease in the alleged particular of reducing the rent is sustained by the evidence. Concessions of the kind that were shown by the defendants, when supported by a consideration, are valid to the extent that a lower rent has been tendered and accepted as satisfaction in full of the installments thus paid. They are not sufficient to establish a change in the written contract so as to affect the amount of future installments of rent where no such change of terms has been made in writing."

We reject plaintiffs' view that their election to remain in residence at the lower rate constitutes consideration. Such election does not constitute a "new consideration" or as it is sometimes referred to, the "bargained for exchange," because plaintiffs were already bound by the original terms of their lifetime leases. *See* Annot., *Necessity and Nature*

*of Consideration Supporting Landlord's Reduction of Rent,* 30 A.L.R.3d 1259 (1970); 49 Am. Jur. 2d *Landlord and Tenant* § 527 (1970). Defendant was therefore free to return to enforcing the rents as originally reserved in the leases. Because defendant sought to collect only future rents, an immediate return to a formula using the last anniversary date CPI does not violate the anniversary date provisions of the leases.[5]

Maximum Potential and Actual Rental Adjustments
Panorama City 1971-1978
(Biennial Adjustment)

Key: ———— adjusted per lease.

— — — adjusted per program cost method.

We turn next to the other theories which plaintiffs alternatively contend bar the 1978 surcharge.

Plaintiffs argue that defendant's letter of May 1971 and the anniversary date adjustments billed to them constitute a permanent waiver of defendant's future right to compute rental adjustments as provided in the leases. A

---

[5]The graph on this page, which is for illustrative purposes only and does not purport to portray actual CPI or "program costs" curves, shows how future rents are determined upon a return to the original rent formula, and highlights the "surcharge" used to bring rents current.

waiver is an intentional and voluntary relinquishment of a known right. *Bowman v. Webster,* 44 Wn.2d 667, 669, 269 P.2d 960 (1954). Defendant argues there was no waiver because there was no consideration to support it. In response, plaintiffs rely on dicta in *Gorge Lumber Co. v. Brazier Lumber Co.,* 6 Wn. App. 327, 335, 493 P.2d 782 (1972), "As a waiver in Washington is unilateral . . . there can be a waiver without consideration as well." The right alleged to have been waived must, however, have existed at the time of the purported waiver. *Bowman v. Webster, supra.* Even unilaterally, defendant could not waive any right it did not yet have. *See United States Fidelity & Guar. Co. v. Bimco Iron & Metal Corp.,* 464 S.W.2d 353 (Tex. 1971); *see also* 28 Am. Jur. 2d *Estoppel and Waiver* § 158 (1966) and 49 Am. Jur. 2d, *supra* § 526. Defendant's right to collect the maximum rent under the lease arose each time an adjustment was called for by the lease. Defendant did in fact waive its right to higher rents by accepting lesser sums from 1971 to 1978. Plaintiffs' argument based on "waiver" therefore fails.

■ Plaintiffs next urge that the equitable doctrine of laches should preclude defendant's asserting its rights under the leases. Laches arises as a bar to a claim where the claimant has unreasonably delayed doing what it should have done "under circumstances permitting diligence" and where an intervening change of conditions makes it inequitable to enforce the claim. *Arnold v. Melani,* 75 Wn.2d 143, 147–48, 437 P.2d 908 (1968). Defendant instituted the program costs method at a time of financial difficulties. After surmounting these difficulties it merely reasserted its rights under the written contracts. Defendant also claims use of program costs resulted in serious inequities among the plaintiffs, with some carrying a disproportionate load of service costs. There is no showing of lack of diligence on defendant's part in electing to return to the original agreements. Nor do we agree that the fact that many of the plaintiffs are of advanced age is the kind of change of condition necessary to support a claim of laches.

Plaintiffs' argument based on accord and satisfaction is inapposite because there is no showing that the rents paid were unliquidated or disputed. *See Kibler v. Frank L. Garrett & Sons, Inc.,* 73 Wn.2d 523, 439 P.2d 416 (1968); *Gorge Lumber Co. v. Brazier Lumber Co.,* 6 Wn. App. at 334. Similarly, plaintiffs' contention that account stated principles prohibit the 1978 surcharge is without merit. There is no showing that rental adjustments and payments from 1971 to 1978 represented a mutual agreement by the parties as to the method of computing future adjustments. *See Goodwin v. Northwestern Mut. Life Ins. Co.,* 196 Wash. 391, 410, 83 P.2d 231 (1938); *Plywood Marketing Assocs. v. Astoria Plywood Corp.,* 16 Wn. App. 566, 574, 558 P.2d 283 96 A.L.R.3d 1231 (1976).

Plaintiffs also contend that RCW 4.16.040, the 6–year statute of limitations for actions on contracts or for rent, or RCW 4.16.130, the general 2–year statute of limitations, should preclude the 1978 surcharge. These statutes, however, deal with the commencement of a cause of action which has already accrued. They do not apply to the prospective assertion of a right such as involved here.

Plaintiffs finally contend that the doctrines of promissory or equitable estoppel prevent defendant from returning to the original method for computing rental increments. After first dismissing this contention entirely, the trial court partially granted plaintiffs' motion for reconsideration. The court found plaintiffs presented a triable issue, but held that it should be litigated individually rather than as a class action. We agree.

Viewing the statements in plaintiffs' affidavits as true, as we must on review of a summary judgment motion, *Lamon v. McDonnell Douglas Corp.,* 91 Wn.2d 345, 349, 588 P.2d 1346 (1979), we find that the affiants were planning to move to a more competitive rental situation, complained to defendant, defendant altered the rent increase computation method which resulted in lower rents, and plaintiffs, relying on the lower rentals, thereupon decided to stay. Defendant disputes plaintiffs' contention that they

threatened to move before the change. It also argues that a decision to stay of itself was not sufficient reliance to invoke estoppel and that plaintiffs in fact reaped a benefit in low rents rather than suffered a detriment.

The prerequisites of promissory estoppel are

(1) a promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

*Hill v. Corbett,* 33 Wn.2d 219, 222–23, 204 P.2d 845 (1949); Restatement of Contracts § 90 (1932). For equitable estoppel, there must be "acts, statements, or admissions" inconsistent with the later claim, action by the other relying upon the acts, and resultant injustice if the actor is permitted to repudiate his action. *Witzel v. Tena,* 48 Wn.2d 628, 632, 295 P.2d 1115 (1956). Although the trial court found the decision to stay was by itself an insufficient detriment, it concluded that the increase in termination costs[6] plaintiffs would incur if they now decided to move was arguably a sufficient detriment and therefore ordered the issue tried.

The trial court also held that the estoppel issues contained too many individual variables to be tried as a class action. The trial court's ruling seems correct to us. Although CR 23(b) permits class actions where the opposing party, here the defendant, has acted or refused to act on grounds applicable to the class, plaintiffs have not met the concurrent requirements of CR 23(a), *i.e.,* that there be questions of law or fact common to the class. There is no indication that the individual plaintiffs who allege they complained to defendant and threatened to move represented all other residents when they individually approached the management. Absent evidence of such rep-

---

[6]The leases may be terminated on 90-days' notice if the residence is rerented and on 15–months' notice if it is not. Thus the plaintiff in the illustration in the text faced a potential increase in termination costs of $2,939.40 if the unit could not be rented.

resentation, the trial court properly withdrew its certification of the case as a class action for the estoppel issues.

The judgment is therefore affirmed.

PEARSON and PETRIE, JJ., concur.

Reconsideration denied May 21, 1981.

Review granted by Supreme Court July 27, 1981.