[No. 224-2.    Division Two.    May 3, 1971.]

ROBERT H. LONG, *Respondent,* v. T-H TRUCKING CO., INC., *et al., Appellants.*

*Dave C. Spencer* (of *Studley, Purcell & Spencer*), for appellants.

*Wayne Roethler*, for respondent.

PEARSON, J.—This case involved cross actions for breach of a logging contract. The trial court allowed the plaintiff, Robert H. Long, a judgment against the defendant, T-H Trucking Co., Inc. in the sum of $5,500, and required plaintiff to hold defendant harmless from any claim of the Washington State Department of Labor and Industries. Defendant's appeal challenges the trial court's findings (1) interpreting the contractual duties, (2) relating to the cause of plaintiff's damages, and (3) as to the measure and amount of damages awarded.

The operative facts giving rise to the dispute are as follows: In October, 1967 the defendant entered the successful bid for certain timber being sold by the State of Washington. Logging of this timber was to be undertaken according to terms of a timber bill of sale and in accordance with state regulations. Since the defendant company did not wish to log the sale area with its own crews, it contracted with one McCarty. McCarty agreed to log, buck, and yard timber to landing sites constructed by him, for $12 per thousand board feet. He also agreed to build necessary roads into the sale area (though defendant undertook to provide the gravel for the roads), and to supply the men and equipment necessary to complete the work before September 30, 1970. Defendant agreed to sort, load, and haul to market all timber delivered to the landing sites. After a few weeks' work, the defendant's agent, Howard, approached plaintiff and asked him to take an assignment of the McCarty contract. Plaintiff agreed to do this for $13 per thousand board feet and a written assignment was made. Because the plaintiff lacked experience as a contract logger,

the defendant aided him in securing equipment with which to undertake his contractual duties. The testimony indicates that the logging plan filed pursuant to state regulations called for an average production of 10 loads of logs per day. It also appears that sufficient equipment to produce this volume of logs was purchased by plaintiff and that for the venture to be profitable, approximately this volume of production would be necessary. The contract itself does not expressly call for this, or any other, level of production, however.

Difficulties soon overtook the parties and they were able to move only about 3½ loads of logs per day on an average, instead of the projected 10. The plaintiff had some trouble securing experienced workers. Testimony indicates that the workers he did have operating his yarding machines and tractors frequently did so in an inefficient manner and sometimes made mistakes that had to be corrected later. In the case of the roads, some reworking by defendant was necessary. Plaintiff's equipment broke down. Unseasonable rains in August and low humidity in September delayed operations.

The defendant also was in part responsible for the difficulties. Gravel for the roads was not provided in timely fashion, though in normal circumstances it might not have been needed, according to the testimony. More important was the failure of the loader furnished by defendant. This machine tended to break down regularly and was difficult to move. Testimony indicates that mobility in a loader is very significant to efficient operation of the type of logging operation undertaken. It is costly and time consuming to move logs to the loader, rather than vice versa. The difficulties with the loader were compounded by defendant's practice of dispatching several trucks at the same time. These trucks would arrive en masse and the loader would soon exhaust logs within the reach of its boom. Delays would be encountered in yarding more logs to the loader, since it could not be efficiently moved. Defendant had

available a more mobile loader which it could have furnished.

At the conclusion of the 1968 logging season, the plaintiff left the logging area. He did not return in 1969, but instead filed this action for loss of profits premised upon the defendant's hindering his performance.

At the conclusion of a lengthy trial, the trial court made several findings of fact to which error is now assigned. The first disputed finding is that the parties intended to remove approximately 10 loads of logs per day from the site and that the plaintiff purchased equipment necessary to do this, in reliance on this agreement or understanding. Also disputed is the finding that the lack of mobility of the loader supplied by the defendant and the lack of coordination in truck dispatching caused a substantial lack of production. Finally, defendant challenges the sufficiency of the proof of damages attributable to its breach.

First, we will consider the question of whether or not the intended agreement of the parties contained an undertaking to produce approximately 10 loads of logs per day. As we have noted, the writing agreed to by T-H Trucking and McCarty, who later assigned his interest therein to plaintiff, contains no statement about the anticipated volume of logs to be produced. It is our view that during the course of negotiations between Howard and Long leading up to the assignment of the logging contract, the parties added a further and consistent provision relating to the volume of production. A written agreement may be modified by subsequent agreement of the parties. *Henderson v. Bardahl Int'l Corp.*, 72 Wn.2d 109, 431 P.2d 961 (1967). Here it is contended that the writing was modified by addition of a not inconsistent supplemental term.

Such a modification may be explicitly stated or it may be implied from the factual context of the parties' dealings. *See Brower Co. v. Garrison*, 2 Wn. App. 424, 468 P.2d 469 (1970). As we said in *Eagle Ins. Co. v. Albright*, 3 Wn. App. 256, 474 P.2d 920 (1970), the context in which an agreement is made is relevant to determine the intent of

the parties to the agreement. When we look at the actions of the parties here, we think that the trial court was justified in finding that they had agreed to a production rate of approximately 10 truckloads of logs per day. The logging plan filed with the state Department of Natural Resources stated that the parties contemplated a production figure averaging 10 loads per day. The parties together sought out and purchased equipment sufficient to produce this volume of logs. Plaintiff was assisted in his equipment buying by defendant's more experienced agent, Howard. Some testimony indicated that a volume approaching 10 loads per day would be necessary if the undertaking were to be profitable. We think that the trial court properly perceived the correct law to be applied to these facts and that its findings of fact relating to this question were supported by substantial evidence. They will thus remain undisturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

■ Next, we move to the question of whether or not the defendant interfered with the plaintiff's performance of his obligation to produce an average of 10 loads per day. It is axiomatic that contracts contain an implied condition that the parties will not interfere with each other's performance, but will cooperate in good faith. *Miller v. Othello Packers, Inc.*, 67 Wn.2d 842, 410 P.2d 33 (1966); *Bignold v. King County*, 65 Wn.2d 817, 399 P.2d 611 (1965). There was sufficient evidence to support the trial court's determination that defendant's truck dispatching procedures and loader difficulties substantially hindered plaintiff's production of logs in adequate volume. Other causes of delay were claimed—some of them the fault of plaintiff's organization —but the trial court was well within the proof in its determination of this fact question. *Thorndike v. Hesperian Orchards, Inc., supra.*

■■ The final issue relates to the measure of damages applied by the trial court. The trial court awarded damages for profits lost during 1968 as a result of defendant's hindrance of production under the contract. First, we do not

think, as defendant contends, the fact that plaintiff's business did not have a long profit history is an absolute bar to this recovery of damages for lost profits. The case of *Larsen v. Walton Plywood Co.,* 65 Wn.2d 1, 390 P.2d 677, 396 P.2d 879 (1964), provides a test for when profits may be recovered. At page 15, the Supreme Court stated that the modern view is that damages may be recovered where:

(1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty.

The first element presents no problem, since most contracts are motivated by expectation of profits and testimony indicates that this one was. The parties entered this agreement assuming they would profit from it. As discussed above, damages here have been found the proximate result of a breach by defendant of the implied condition of cooperation. The third element presents the greatest difficulty, but we think that the plaintiff here established expected profits with reasonable certainty. The price to be paid was specified in the contract. Expert witnesses testified as to the costs ordinarily incurred in logging areas like the one in question. The amount of damages here is difficult to prove with exactness. Some liberality must be allowed where the plaintiff presents the best available evidence. *Larsen v. Walton Plywood Co., supra.* Expert testimony alone will suffice. We think that the plaintiff adequately proved the total amount of expectable net profits lost.

This leaves only the question of determining the total amount proved as attributable to the defendant's breach. To do this, we go beyond the Larsen rule and hold that where the amount of damage is not susceptible of exact apportionment between the defendant's fault and other factors contributing to the loss, absolute certainty is not required. The trier of fact must exercise a large measure of responsible and informed discretion where the fact of damage is proved. *Wenzler & Ward Plumbing & Heating Co. v. Sellen,* 53 Wn.2d 96, 330 P.2d 1068 (1958); *Reynolds Metals*

*Co. v. Electric Smith Constr. & Equip. Co.,* 4 Wn. App. 695, 483 P.2d 880.

Apropos to the instant case is the statement from 14 Cal. Jur. 2d § 65, 690, 691 (1954), which was quoted with approval in *Wenzler & Ward Plumbing & Heating Co. v. Sellen, supra* at 100:

> Therefore, when it is clearly apparent that the plaintiff has sustained actual damage from the defendant's wrong, a liberal rule is applied with respect to determining the amount of that damage. Moreover, where proof of actual damage to the plaintiff is available, uncertainty as to the exact amount thereof cannot deny to the plaintiff a right to recover any compensation at all. This rule applies both to a loss of profits by the plaintiff and to items of expense incurred by him as a result of his wrongful discharge from employment."

The trial judge here heard all the evidence. It had before it an acceptable total for the amount of damage. The trial court explained in its memorandum opinion that after consideration, it believed that production could have been increased 20 per cent, had defendant properly performed. By applying this percentage to the total proved lost profits, the damage figure allowed was arrived at. On the basis of its informed discretion, we think the trial court could apportion damages according to the fault demonstrated in the evidence.

Judgment affirmed.

PETRIE, C.J., and ARMSTRONG, J., concur.