[No. 5155–1. Division One. October 9, 1978.]

BUSINESS FACTORS, INC., *Appellant,* v. TAYLOR–
EDWARDS WAREHOUSE & TRANSFER COMPANY,
INC., *Respondent.*

*Barokas & Martin* and *Larry L. Barokas,* for appellant.

*Williams, Lanza, Kastner & Gibbs* and *Jerry B. Edmonds,* for respondent.

CALLOW, J.—The plaintiff Business Factors appeals from a judgment denying its claim against Taylor–Edwards for breach of a certificated field warehouse receipt agreement by allowing the depletion of the inventory looked to as collateral. We find that the trial court was correct in its decision that while Taylor–Edwards did not perform the agreement properly, Business Factors' ongoing interest in and daily control of the financed business insured that the inventory was only reduced with its authorization. Such authorization amounted to a modification of its contract with Taylor–Edwards, and Business Factors was estopped from enforcing the original contract.

Johnzer Products (third–party defendant below and not a party to this appeal) was in the business of manufacturing audio speakers and maintained an inventory. From 1972 until its financial collapse in September 1975, Johnzer Products was a client of Business Factors, which finances small businesses. Business Factors was a lender to Johnzer, and one of its securities was the latter's inventory. In order to assure Business Factors of the adequacy of its collateral, Johnzer entered into a field warehousing agreement with Taylor–Edwards Warehouse & Transfer Company, a public warehouse company.

The financial arrangements between Business Factors and Johnzer Products began in 1972 when Business Factors

began to factor the accounts receivable of Johnzer Products. The factoring procedure operated in the following manner: Once a shipment of stereo speakers had been manufactured by Johnzer Products it would be shipped to the purchaser, thereby creating an account receivable or the right to payment for the goods; Johnzer would then present Business Factors with a list of the accounts receivable for inspection and approval due to the fact that Johnzer needed capital so badly it could not wait for 30 to 90 days for payment on the shipment. In the event that Business Factors found the credit of the purchaser to be acceptable, Business Factors would advance 80 percent of the amount owing to Johnzer for working capital, and when payment for the goods was received by Johnzer it would then pay back the money owed to Business Factors, plus 1 percent per month interest and a "service fee" of from 1/4 to 1 percent per month, for a total yearly percentage rate of from 15 to 24 percent for the factoring program. During the last few months that Johnzer Products was in operation, Business Factors, through the factoring program, financed virtually every shipment that left Johnzer's warehouse.

As a part of the factoring program, Business Factors was in constant contact with Johnzer Products and was aware of virtually every shipment from Johnzer. In fact, through its financial arrangements with Johnzer Products, Business Factors came to dominate and control Johnzer Products to such a degree that it was Business Factors who decided when to ship and when not to ship, and which orders to fill.

The amounts advanced under the factoring program were secured by a security interest in all inventory, equipment, accounts receivable and the proceeds from the sale thereof. Everything, physical or intangible, was collateral for the loans made by Business Factors. Business Factors' security interest existed only as long as the inventory was maintained in Johnzer Products' plant. Once the inventory had been shipped to a buyer in the ordinary course of business, the security interest was destroyed. RCW 62A.9–307.

Following the initiation of the factoring program, Business Factors, knowing that Johnzer Products was undercapitalized and in need of additional funds, advanced Johnzer Products approximately $50,000. This additional loan was secured by the same collateral securing the loans under the factoring program.

The prefactoring of purchase orders was first discussed in a meeting held on June 10, 1975, between principals of Business Factors, Taylor–Edwards and Johnzer. Business Factors indicated at that time that the prefactoring of purchase orders would substantially increase the inventory of Johnzer Products. The prefactoring program was established shortly after the June 10 meeting and continued until the end of Johnzer Products' operations. The prefactoring, factoring and inventory programs all existed simultaneously. The prefactoring program worked in the following manner: Whenever a purchase order could not be filled with the existing inventory on hand at Johnzer Products, the production manager would fill out a prefactoring list for the required raw materials; the list would then be presented to Business Factors who would, if it approved the purchaser's credit, advance the funds for the required raw materials; these raw materials would then be stored with the other inventory and used for the production of speakers; the amount advanced to Johnzer was only a fraction of the sales price, so once the speakers were manufactured and shipped, Business Factors would then factor the accounts receivable, advancing Johnzer Products the purchase price less the amount advanced under the prefactoring program. As with the factoring program and other loans, the advances made under the prefactoring program were secured by all inventory, accounts receivable and equipment.

During the period immediately preceding the collapse of Johnzer Products, Business Factors was prefactoring virtually all of Johnzer's purchase orders and was in constant contact with Johnzer Products. Because of its advance approval of purchases of raw materials, Business Factors

was fully aware of every component part received by Johnzer Products. During July and August of 1975, factoring and prefactoring loans were the only significant source of cash flow to Johnzer.

On February 6, 1974, Business Factors and Johnzer Products hired Taylor–Edwards to set up and maintain a field warehouse[1] for all inventory of Johnzer Products. The stated value[2] at which Taylor–Edwards was instructed to maintain Johnzer Products' inventory was subsequently reduced from $70,000 to $50,000. The lowering of the inventory "target level" and many other business decisions were agreed to by Business Factors and Taylor–Edwards by telephone. It is undisputed that Taylor–Edwards accurately reported inventory levels throughout the relevant time period.

The inventory remained in Johnzer's plant but was segregated by a painted line from the unsecured items. Taylor–Edwards employed a woman employee of Johnzer's to act as its "bonded warehouse person." She remained in the employ of Johnzer and thus served in a dual capacity. Her function was to count the inventory and sign the warehouse receipts which were issued against the inventory. The warehouse receipts represented the shifting inventory and served as collateral for the financing.

The inventory of Johnzer Products fell below the $50,000 level in April 1975 and continued to drop until the economic collapse of Johnzer Products in the latter part of September 1975. Business Factors was aware that the value

---

[1] "Field warehousing is a device whereby, in juxtaposition to the premises of a trader or processor, commodities may be stored by a warehouse company against receipts." 68 Am. Jur. 2d *Secured Transactions* § 82 n.80 (1973). It should be noted that under the warehouse agreement, as drafted by Business Factors, Taylor–Edwards was *not* required to release commodities only upon receipt of a warehouse receipt. Hence, the warehouse installed by Taylor–Edwards was more of a "quasi" field warehouse than a "true" field warehouse.

[2] The stated value of the component parts of the inventory (their purchase price) had no relation to the fair market value of the inventory. Inventory with a stated value of over $10,000 would sell on the open market for a little over $1,000.

was less than $50,000 at all times after April 30, 1975; nonetheless, Business Factors authorized shipments after that date.

After the collapse, Business Factors called its note and demanded the security from Taylor–Edwards. At this point in time, the inventory, according to the stated values, was worth approximately $10,000. Later this was liquidated by agreement and produced $1,193.96. The stated values were those decided upon at the time of execution of the agreement. Taylor–Edwards refused to make good on its promise to deliver the inventory of a stated value of $50,000, and also refused to turn over the remaining property.

Business Factors initiated this action alleging that Taylor–Edwards had failed to maintain an inventory with a stated value in excess of $50,000. The trial court found that Business Factors had waived its rights under the contract and/or was estopped from asserting any such rights. In addition, the trial court found that Business Factors had failed to cooperate with Taylor–Edwards in its performance of the contract and, in fact, prevented Taylor–Edwards from performing. The court awarded to Taylor–Edwards the remaining proceeds from the sale of inventory, having found that the warehouseman's lien of Taylor–Edwards was superior to all other liens.

Field warehousing is a way of bringing about the security relationship of a pledge. It is an arrangement for allowing the pledgor a more convenient access to the pledged goods, while the goods are actually in the custody and control of a third person on the pledgor's premises. 68 Am. Jur. 2d *Secured Transactions* § 82 (1973). The third–party warehouseman thus becomes an agent of the pledgee or secured party. The warehouseman's actions are governed by the contract between him and the secured party. This relationship has validity as a secured transaction only where the secured party has effective control over the goods through the field warehouse company and the pledgor does not act as his own warehouseman. *Whitney Nat'l Bank v. Sandoz,*

362 F.2d 605 (5th Cir. 1966);[3] *In re United Wholesalers, Inc.*, 274 F.2d 316 (7th Cir. 1960).

The borrower or pledgor must have actually surrendered "open, unequivocal, exclusive possession" of his property to the warehouse company. L. Lakin & H. Berger, *A Guide to Secured Transactions* 12 (1970). This is best accomplished by segregating the property involved in an enclosure which can be locked by the warehouse employee. This enclosure may be a room or perhaps a floor–to–ceiling fence, but should be sufficient to require one without a key to actually break and enter to gain entrance. The enclosure should have signs indicating that the property contained is in the hands of the warehouse company. L. Denonn, *Secured Transactions Under the Original and the Revised UCC* 72 (6th ed. 1974). The warehouse company may properly employ as the keeper of the field warehouse an employee of the borrower–pledgor, but the employee must understand

---

[3]It is stated in *Whitney Nat'l Bank v. Sandoz, supra* at 607:

"'Field warehousing,' . . . 'is a term applied to an arrangement whereby a wholesaler, manufacturer, or merchant finances his business through the pledge of goods remaining on his premises. The arrangement is valid and effective where there is an actual delivery to the warehouseman by the bailor who has hired the warehouseman and given him exclusive possession of the warehouse goods. The warehouseman in turn issues warehouse receipts which serve to secure loans made by third parties to the bailor on the security of the deposited goods. In effect, it is an arrangement whereby the borrower, instead of taking his goods to the warehouse, arranges for the warehouseman to come to his premises. It is a limited type of warehousing as distinguished from a public warehouse.' Lawrence Warehouse Company v. KcKee, 5th Cir. 1962, 301 F.2d 4. See also Whitney, Law of Modern Commercial Practices 938, § 664; Financing Through Field Warehousing, 69 Yale L.J. 663.

"For warehouse receipts issued by a field warehouseman to have validity they must be issued by a bona fide, independent warehouseman. The borrower cannot be his own warehouseman and receipts issued by one who is a warehouseman in name only can have no validity. The portion of the borrower's property set aside as a warehouse must be under the exclusive control of the warehouseman. The warehoused goods must be in the exclusive possession of the warehouseman, with the borrower excluded as well as others. There must be adequate markings of the warehouse area and of the warehoused goods. The goods must be so stored and so described in the warehouse receipts that there can be an identification of specific goods to match particular descriptions. Goods are to be released only upon the production and surrender of the receipts covering the goods withdrawn." (Citations omitted.)

that with regard to the warehoused property, he is working for the warehouse company and not for his regular employer. 68 Am. Jur. 2d *Secured Transactions* § 85 (1973).

The warehoused property is under the control of the lender–pledgee through the agency of the warehouse company and its employee. The property is to be released from the warehouse only (1) upon addition of other property which is, according to prior agreement, of comparable value, (2) where the value of property remaining is still greater than the amount which must be maintained under the warehousing contract, or (3) with permission of the lender–pledgee. L. Denonn, *Secured Transactions Under the Original and the Revised UCC* 74–75 (6th ed. 1974).

■ Here, the field warehousing arrangement was operated improperly. A painted line on the floor without any signs designating the goods as property of the warehouse or any restriction of access by the pledgor's employees at least raises a question of fact as to the proper establishment of a field warehouse. *See, e.g., McCaffey Canning Co. v. Bank of America*, 109 Cal. App. 415, 294 P. 45 (1930). In addition, Johnzer in effect acted as its own warehouseman; its employees were able to add to or subtract from the inventory at will. The field warehouse company did not require the presentation of warehouse receipts in order to remove inventory from the field warehouse in violation of its contract. Thus, Taylor–Edwards would be liable to Business Factors were it not for the connivance of Business Factors in the dissipation of the inventory.

The authorization by Business Factors of the reductions of inventory through shipment and production amounted to a modification of its contract with Taylor–Edwards.

A written agreement may be modified by subsequent agreement of the parties. . . .

Such a modification may be explicitly stated or it may be implied from the factual context of the parties' dealings.

*Long v. T–H Trucking Co.,* 4 Wn. App. 922, 925, 486 P.2d 300 (1971). There was no obligation on the part of Taylor–Edwards to stop shipments which had been authorized by Business Factors. Taylor–Edwards' duty under the contract was only to act as the agent of Business Factors in controlling the inventory; there is no duty on the part of an agent to stop what his principal has authorized.

Business Factors is now estopped from asserting the original terms of its contract with Taylor–Edwards. *Kessinger v. Anderson,* 31 Wn.2d 157, 196 P.2d 289 (1948), stated that the following must be shown to create an estoppel in pais: (1) an admission, statement or act inconsistent with the claim afterwards made; (2) action by the other party on the "faith" of such admission, statement or act; and (3) injury to the other party resulting from allowing the first party to contradict or repudiate such admission, statement or act. Here, Business Factors (1) authorized all the shipments from the field warehouse (2) causing Taylor–Edwards to release the property from the warehouse (3) resulting in injury to Taylor–Edwards if Business Factors is now allowed to enforce the original contract after authorizing modification of that contract.

We find no support for the other errors asserted. *Roberts v. Atlantic Richfield Co.,* 88 Wn.2d 887, 568 P.2d 764 (1977).

The judgment is affirmed.

FARRIS, C.J., and DORE, J., concur.