**MILGARD TEMPERING, INC.,**
Plaintiff–Appellee/Cross–Appellant,

v.

**SELAS CORPORATION OF AMERICA,**
a foreign corporation,
Defendant–Appellant/Cross–Appellee.

Nos. 87–4067, 87–4068.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1989.

Decided April 24, 1990.

Edward M. Lane, of Edward M. Lane & Associates, Tacoma, Wash., James M. Sweet and David L. Hall, Drinker Biddle & Reath, Philadelphia, Pa., for defendant-appellant/cross-appellee.

J. Richard Creatura, Sal Mungia and Bradley A. Maxa, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Wash., for plaintiff-appellee/cross-appellant.

Before TANG, HALL, and BRUNETTI, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

This appeal marks the end of nearly seven years of litigation over a "sure fire" glass tempering furnace purchased over ten years ago. The seller, Selas Corporation of America ("Selas") appeals the judgment of the district court awarding the buyer, Milgard Tempering, Inc. ("Milgard"), damages resulting from its failure to repair serious defects in the furnace. Milgard cross-appeals the district court's denial of attorneys' fees. We have jurisdiction under 28 U.S.C. § 1291 (1988) and affirm.

I

Milgard Manufacturing, Inc. ("Milgard Manufacturing") cuts and installs glass for use in residential construction. On June 11, 1979, it entered into a carefully-negotiated contract with appellant/cross-appellee Selas to purchase a horizontal batch tempering furnace. With Selas' consent, Milgard Manufacturing assigned the contract to appellee/cross-appellant, Milgard.

Under the contract, Selas agreed to design and manufacture the furnace for $1.45 million.[1] Its design was complex, and in Selas' eyes, experimental. However, Selas marketed it as a working piece of equipment. The contract provided a $50,000 bonus if Selas delivered all the major components before January 31, 1980. It also provided a penalty of $5,000 per week (not to exceed a total of $25,000) for every week of late delivery after March 31, 1980. Selas failed to meet either deadline, having completed delivery of major components in November, 1982.

Selas agreed to assemble the furnace at Milgard's plant and to assist in a "debugging period" that both parties expected would end June or July 1980. The contract also required Selas, in a series of preacceptance tests, to demonstrate that the furnace was capable of achieving designated yield and cycle rates.[2] Section 28.5 of the

---

1. Selas retained a security interest in the furnace to insure payment. Contract § 28.1(a).

2. "Yield rate" refers to the percentage of saleable glass tempered in a given batch. "Cycle

contract limited Selas' liability for breach of warranty to repair or replacement of the furnace and barred liability for consequential damages. The parties modified the contract and agreed to forego the preacceptance tests and instead place the furnace in commercial production in July, 1980, thus making glass available for the "debugging" process.

By January, 1982, Selas continued work on the furnace, but failed to achieve yield and cycle rates that substantially conformed with the contract specifications. Milgard then filed suit against Selas for breach of contract.

In March 1982, the parties, without counsel, attempted to enter into a contractual agreement to settle the dispute. Under the proposed agreement, Selas would take over the tempering operation for 60 days to demonstrate the furnace's ability to achieve a 90% yield rate. It would also pay any operating losses Milgard incurred during that period. Then, if Milgard operated the furnace for six months without incident, Selas would "finetune" the furnace to achieve a 95% rate. Selas did the work and paid Milgard's operating losses.

Milgard then dismissed the suit without prejudice. However, during the six-month period, the furnace failed to perform to the specifications of either the contract or the attempted settlement agreement.

Milgard initiated a second lawsuit on March 4, 1983, alleging breach of contract and breach of warranty. On June 29, 1984, Judge Tanner in the district court granted summary judgment in favor of Selas. He found that the cap on consequential damages was a conscionable allocation of risk between sophisticated parties and therefore enforceable. He further held that the parties had reached an accord and satisfaction in March, 1982. The court awarded Selas the balance of the purchase price minus the delivery bonus. It also awarded Selas attorneys' fees under § 28.1(f) of the contract but denied fees to Selas' in-house counsel for time devoted to the litigation.

This court, in *Milgard Tempering, Inc. v. Selas Corp. of America*, 761 F.2d 553 (9th Cir.1985) [hereinafter *Milgard I*], reversed and remanded for trial. We held that the enforceability of the consequential damages limitation not only depended upon the conscionability of the provision when drafted, but upon the circumstances surrounding Selas' breach and inability to repair. Because these circumstances were disputed, we found summary judgment inappropriate. *Id.* at 556–57. We further noted that serious factual disputes surrounding the alleged accord and satisfaction required trial of that issue as well. We also vacated the award of attorneys' fees pending determination of the prevailing party at trial.

On remand, after a five-week bench trial, Judge Bryan in the district court found that the furnace had never lived up to the specifications in the contract. He held that the limited repair remedy failed of its essential purpose and that Selas' default was sufficiently severe to expunge the cap on consequential damages. He awarded Milgard $1,076,268 in net damages. He also denied Milgard's claims for attorneys' fees.

Nearly two months after the trial judge delivered his oral ruling,[3] Selas filed a motion for a new trial and new judge, alleging that an ex parte contact between the law clerk assigned to the case and Milgard's counsel created the appearance of judicial impropriety. The court denied the motion and entered its judgment order the following day.

Selas appeals the judgment and denial of its motion for new trial and judge. Milgard cross-appeals the denial of attorneys' fees. We affirm.

II

Selas first argues that the district court erred in ruling that the limited repair remedy failed of its "essential purpose" and

rate" rate refers to the speed at which glass of a particular size and thickness is tempered.

3. Judge Bryan delivered his Oral Rulings on March 24 and March 26, 1987. He issued written Findings of Fact and Conclusions of Law [hereinafter Findings] June 18, 1987.

that such failure lifted the contractual cap on consequential damages.

## A

Section 28.5 of the contract limited Milgard's remedies in the event of breach of warranty to repair or replacement of the defective equipment.[4] Such limitations on a party's remedies are permitted by Washington's version of the U.C.C., Wash.Rev. Code § 62A.2–719(1)(a) (West Supp.1989).[5]

An exclusive or limited remedy, however, must be viewed against the background of §62A.2–719(2), which provides: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title." This section requires a court to examine the contract in general and the remedy provision in particular to determine what

the remedy's essential purpose is and whether it has failed.

A limited repair remedy serves two main purposes. First, it serves to shield the seller from liability during her attempt to make the goods conform. Second, it ensures that the buyer will receive goods conforming to the contract specifications within a reasonable period of time. *See Chatlos Systems v. National Cash Register Corp.,* 635 F.2d 1081, 1085 (3d Cir. 1980), *cert. dismissed,* 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982); *S.M. Wilson & Co. v. Smith Int'l, Inc.,* 587 F.2d 1363, 1375 (9th Cir.1978) (citing Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of U.C.C. Section 2–719(2),* 65 Calif.L.Rev. 28, 63 (1977)).

■ A contractual provision limiting the remedy to repair or replacement of defective parts fails of its essential purpose

---

**4.** § 28.5 of the contract reads in its entirety:

**Liability**

In the event of a breach of any warranty, express, implied or statutory, or in the event the equipment is found to be defective in workmanship or material or fails to conform to the specifications thereof, *[Selas'] liability shall be limited to the repair or replacement of such equipment as is found to be defective or non-conforming,* provided that written notice of any such defect or non-conformity must be given to Selas within 1 year from the date of acceptance, or 15 months from completion of shipment, whichever first occurs. In the event that acceptance is delayed through the fault of Selas, then the Selas 1 year warranty shall be applicable and not begin until the date of acceptance. *Selas assumes no liability for no consequential or incidental damages of any kind (including fire or explosion in the starting, testing, or subsequent operation of the equipment),* and the Purchaser assumes all liability for the consequences of its use or misuse by the Purchaser or his employees. *In no event will Selas be liable for damages resulting from the non-operation of Purchaser's plant, loss of product, raw materials or production as a result of the use, misuse or inability to use the equipment covered by this proposal* or from injury to any person or property alleged to be caused by or resulting from the use of the product produced with the equipment to be supplied to Purchaser by Selas pursuant to this proposal whether the customer or Purchaser is mediate or immediate. Purchaser hereby releases [Selas] of and from and indemnifies [it] against, all liability not specifically assumed by [it] hereunder. (Emphasis added).

**5.** § 62A.2–719 reads in its entirety:

**Contractual modification or limitation of remedy**

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title.

(3) Limitation of consequential damages for injury to the person in the case of goods purchased primarily for personal, family or household use or of any services related thereto is invalid unless it is proved that the limitation is not unconscionable. Limitation of remedy to repair or replacement of defective parts or non-conforming goods is invalid in sales of goods primarily for personal, family or household use unless the manufacturer or seller maintains or provides within this state facilities adequate to provide reasonable and expeditious performance of repair or replacement obligations.

Limitation of other consequential damages is valid unless it is established that the limitation is unconscionable.

within the meaning of § 62A.2–719(2) if the breaching manufacturer or seller is unable to make the repairs within a reasonable time period. *Lidstrand v. Silvercrest Indus.*, 28 Wash.App. 359, 623 P.2d 710, 714 (1981). *Accord Milgard I*, 761 F.2d at 556. It is not necessary to show negligence or bad faith on the part of the seller, for the detriment to the buyer is the same whether the seller's unsuccessful efforts were diligent, dilatory, or negligent. *See Wilson*, 587 F.2d at 1375.

▪ The district court in this case found that the furnace had never lived up to the specifications of the contract. Finding 23. Moreover, the court found that the few successful improvements were not made within a reasonable period of time, taking over two and one-half years.[6] We agree that under these circumstances, the unreasonable delay and ultimate failure in repair made the repair remedy ineffective; thus, the remedy failed of its essential purpose.

### B

▪ Washington courts have not addressed the issue of whether failure of a limited repair remedy may serve to invalidate a consequential damages exclusion. Therefore, it is our responsibility to determine how the state's supreme court would resolve it. In undertaking this task, we may draw upon recognized legal sources including statutes, treatises, restatements, and published opinions. *Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir.), *cert. denied*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). We may also look to "well-reasoned decisions from other jurisdictions." *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir.1980). We review the district court's construction of Washington law de novo. *See In re McLinn*, 739 F.2d 1395, 1400 (9th Cir.1984) (en banc).

### 1

We begin our analysis with *Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1314–15 (9th Cir.1984). In that case, we held that under Washington law, the failure of a repair remedy does not automatically remove a cap on consequential damages. We predicted that Washington courts would take a case-by-case approach and examine the contract provisions to determine whether the exclusive remedy and damage exclusions are either "separable elements of risk allocation" or "inseparable parts of a unitary package of risk-allocation." *Id.* at 1315 (quoting district court).

If the exclusions are inseparable, we reasoned, a court's analysis should track the Official Washington Comments to § 62A.2–719(2) [hereinafter Washington Comments], which explain that the subsection "relates to contractual arrangements which become oppressive by change of circumstances...." 747 F.2d at 1315. We then affirmed the district court's ruling that the seller's arbitrary and unreasonable refusal to live up to the limited repair clause "rendered the damages limitation clause oppressive and invalid." *Id.*

*Fiorito* relied heavily on this circuit's analysis of Cal.Com.Code § 2719(2) (West 1964) in *Wilson*, 587 F.2d 1363. *Wilson* involved a contract between commercially sophisticated parties for a tunnel boring machine. The contract contained both a limited repair clause and a cap on consequential damages. After concluding that the repair remedy failed of its essential purpose within § 2719(2), this court held that the bar to consequential damages remained enforceable. We explained:

Parties of relatively equal bargaining power negotiated an allocation of their risks of loss. Consequential damages were assigned to the buyer, Wilson. The

---

**6.** For the first 2.5 years of operation, the furnace remained incapable of tempering saleable glass consistently. Finding 13.

Although the contract did not guarantee a specific time for completion of debugging, the court found that the writing was not completely integrated. Finding 4. Looking at the commercial context, the court found that both parties implicitly agreed that the complete period for startup and "debugging" would take about eight weeks. Finding 38. Whether an agreement is incorporated in a writing is a question of fact. *Silverdale Hotel Assoc. v. Lomas & Nettleton Co.*, 677 P.2d 773, 778 (Wash.App.), *rev. denied*, 101 Wash.2d 1021 (1984). This finding is not clearly erroneous and cannot be disturbed.

machine was a complex piece of equipment designed for the buyer's purposes. The seller Smith did not ignore his obligation to repair; he simply was unable to perform it. This is not enough to require that the seller absorb losses the buyer plainly agreed to bear. Risk shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated. *The default of the seller is not so total and fundamental as to require that its consequential damage limitation be expunged from the contract.*

*Id.* at 1375 (emphasis added). However this court in *Wilson* quickly pointed out that its holding was limited to the facts and was in no way intended to state that consequential damages caps always survive failure of limited repair remedies. *Id.* at 1375–76.

### 2

■ The district court in the instant case found Selas' default "fundamental, but not total." Nonetheless, it found the breach sufficiently fundamental to remove the cap on consequential damages. Selas claims that the court misunderstood the legal standard and that consequential damages may be allowed only when the seller's breach is both total and fundamental.[7]

We agree that the district court's characterization of the case law was flawed.[8] However, the analysis it employed was not. This court has found nothing magical about the phrase "total and fundamental default" in relation to U.C.C. 2–719(2). In *Fiorito*

we eschewed such wooden analysis, leaving "[e]ach case [to] stand on its own facts." *Id.*, 747 F.2d at 1314 (quoting *Wilson*, 587 F.2d at 1376). We further expressed our distaste for talismanic analysis in *Milgard I*, finding the "oppressive circumstances" analysis utilized by *Fiorito* and the Washington Comments and the "total and fundamental" default analysis in *Wilson* in accord with each other. 761 F.2d at 556.

The task before the district court was to examine the remedy provisions and determine whether Selas' default caused a loss which was not part of the bargained-for allocation of risk. *See RRX*, 772 F.2d at 547; *Fiorito*, 747 F.2d at 1315. *Cf. Waters v. Massey–Ferguson, Inc.*, 775 F.2d 587, 590–91 (4th Cir.1985) (interpreting identical version of U.C.C. 2–719(2) enacted in South Carolina); *Kelynack v. Yamaha Motor Corp.*, 152 Mich.App. 105, 394 N.W.2d 17, 20 (1986); *Adams v. J.I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1, 7–8 (1970). This was the analysis that the district court actually employed.

We agree with the district court's decision to lift the cap on consequential damages. Milgard did not agree to pay $1.45 million in order to participate in a science experiment. It agreed to purchase what Selas represented as a cutting-edge glass furnace that would accommodate its needs after two months of debugging. Selas' inability to effect repair despite 2.5 years of intense, albeit injudicious,[9] effort caused Milgard losses not part of the bargained-for allocation of risk. Therefore, the cap on consequential damages is unenforceable.

---

7. Selas does not challenge the court's finding that the limited repair remedy and the consequential damages limitation were part of a single risk-allocation package.

8. In his March 24 Oral Ruling, the district judge noted that while *Wilson* and *RRX Indus. v. Lab–Con, Inc.*, 772 F.2d 543, 547 (9th Cir.1985), referred to "total and fundamental breach," *Fiorito* and *Milgard I* referred to consequential damages limitations becoming "oppressive by change of circumstances." He felt this circuit had developed two slightly different tests, the former being more stringent. Transcript at 3308–10.

9. Selas exacerbated the repair problem by not providing a qualified process engineer during the initial debugging period and stubbornly refusing to replace the unproven ircon transfer system with more reliable methods that were available. We therefore agree with the district court's conclusion that "Selas did not make a completely open and honest effort to bring the furnace into compliance with the contract requirements." Finding 88. However, as noted earlier, the question of Selas' good faith is not dispositive of this appeal.

## III

Next, Selas challenges the district court's determination of damages. The court had found that for 21 months (April 1, 1980 to December 31, 1982), the furnace was incapable of reaching any of the yield rates outlined in the contract. Thereafter, the furnace could reach a few with some regularity. Accordingly, the district court calculated damages for two time periods. First, it calculated Milgard's lost profits during the 21–month "damage" period. Second, it calculated losses Milgard did and would incur after December 31, 1982.

In calculating the award for the damage period, the district court noted that Milgard earned an actual profit of $591,537 during that time. To determine what further profits Milgard lost during that period as a result of Selas' breach, the court used Milgard's production from January 1, 1983 to September 30, 1984 as a "benchmark" period. During that period, Milgard earned a net profit of $674,900. The court multiplied the benchmark figure by a factor of 1.5 and reduced the product to account for both depreciation of the furnace over its 11–year life span and losses caused by Milgard's own inefficient operation during the damage period. The resulting award for lost profits was $860,497.

In determining damages incurred after December 31, 1982, the court drew upon testimony from Milgard's expert economist, Dr. Peter Finch. Dr. Finch estimated that the furnace's continued inability even to approach the specified cycle and yield rates did and would cause Milgard in excess of $300,000 in lost profits after that date. The court discounted parts of Finch's testimony, including his assumption that the furnace's useful life exceeded 11 years, and awarded Milgard an additional $252,608.

Selas challenges both awards as speculative and unsupported by the evidence. Alternatively, it claims that the district court made a mathematical error in computing the lost profits for the damage period.

## A

■ The determination of damages is one of fact. *V.C. Edwards Contracting Co. v. Port of Tacoma*, 83 Wash.2d 7, 514 P.2d 1381, 1387 (1973). Thus, in accordance with Federal Rule of Civil Procedure 52(a), this court will not disturb an award of damages unless it is "clearly unsupported by the evidence," *Roberts v. College of the Desert*, 870 F.2d 1411, 1417 (9th Cir.1988), or it "shocks the conscience," *Brady v. Gebbie*, 859 F.2d 1543, 1558 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989).

The basic test for recovery of lost profits was laid out in the seminal Washington Supreme Court opinion, *Larsen v. Walton Plywood Co.*, 65 Wash.2d 1, 390 P.2d 677 *modified*, 65 Wash.2d 1, 396 P.2d 879 (1964):

> [Lost profits] are properly recoverable as damages where (1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate cause of defendant's breach, and (3) they are proven with reasonable certainty.

390 P.2d at 686 (citation omitted). The third element, dealing with certainty, "is concerned more with the *fact of damage than with the extent or amount of damage.*" *Alpine Indus., Inc. v. Gohl*, 30 Wash.App. 750, 637 P.2d 998, 1001 (1981), *opinion changed*, 645 P.2d 737 (Wash.App. 1982) (quoting *Gaasland Co. v. Hyak Lumber & Millwork, Inc.*, 42 Wash.2d 705, 257 P.2d 784, 788 (1953)) (emphasis in original). This comports with the long-held view that a defendant should not profit from the difficulty in proving exact damages, particularly if his breach contributes to that difficulty. *See Butcher v. Garrett–Enumclaw Co.*, 20 Wash.App. 361, 581 P.2d 1352, 1361, *rev. denied*, 91 Wash.2d 1004 (1978) (quoting 5 Corbin on Contracts § 1023, at 133); *Box v. Crowther*, 3 Wash. App. 67, 473 P.2d 417, 423 (1970) (relying upon Restatement of Contracts § 331, comment a (1932)).

Until *Larsen*, Washington courts strictly applied the "new business" corollary to the lost profits rule: if the complaining party does not have a profit history prior to the period of damage, profits are denied as too

speculative. *See Ingersol v. Seattle–First Nat. Bank,* 63 Wash.2d 354, 387 P.2d 538 (1963); *Hole v. Unity Petroleum Corp.,* 15 Wash.2d 416, 131 P.2d 150 (1942); *Lockit Cap Co. v. Glove Mfg. Co.,* 158 Wash. 183, 290 P. 813 (1930). Concluding that strict adherence to this rule could produce unjust results, the *Larsen* court adopted the rule that " 'lost profits will not be denied merely because a business is new if factual data is [sic] available to furnish a basis for computation of probable losses.' " 390 P.2d at 687 (quoting *Barbier v. Barry,* 345 S.W.2d 557, 563 (Tex.Civ.App.1961)).

■ Expert testimony alone can provide a sufficient factual basis for an award of loss of profits. *Alpine,* 637 P.2d at 1001; *Butcher,* 581 P.2d at 1362. If the opinion of an expert provides a reasonable basis for inference, the court is freed from "the realm of uncertainty and speculation." *Larsen,* 390 P.2d at 687. Expert testimony must be based upon tangible evidence rather than mere speculation or hypotheses. *Id.* at 688. The court then must exercise its sound discretion in determining the amount of damages. *Barnard v. Compugraphic Corp.,* 35 Wash.App. 414, 667 P.2d 117, 120 (1983). *Cf. Long v. T–H Trucking Co.,* 4 Wash.App. 922, 486 P.2d 300, 303 (1971) (where difficult to ascertain what amount of loss was caused by defendant, trier of fact "must exercise a large measure of responsible and informed discretion"). Expert testimony with partial deficiencies may nevertheless support a finding of lost profits; the trier of fact is free to discount its weight accordingly, even if no evidence sustains the exact amount it awards. *Alpine,* 637 P.2d at 1002.

■ All three tests for loss of profits have been met in this case. First, the district judge made the factual finding that the parties contemplated the possibility of lost profits. Because § 28.5 of the contract refers to such profits, this finding is not clearly erroneous.

Second, the district court found that the failure of the machine to conform to the contract specifications proximately caused Milgard to lose profits. Selas does not challenge this finding and we do not disturb it.

Third, the district court had a sufficient factual basis upon which to make its computation of lost profits. As forecast by *Larsen* and its progeny, Milgard's sole source of evidence in this area was its expert witness, Dr. Finch. Although the district judge found some of Dr. Finch's figures difficult to swallow, he pointed out that that did not negate them. Transcript at 3438. Consistent with *Alpine,* 637 P.2d at 1002, the court discounted the damage award in accordance with the weight of Finch's testimony. Finding 114.[10] Therefore, we find no error.

**B**

■ Selas further challenges the award of $252,608 on the ground that the written contract contained no specific guarantees of cycle rates. This argument is unpersuasive. The district court did not base its award on a breach of a guarantee (express or implied), that the furnace would actually run at the cycle rates specified in § 2.5 of the contract.[11] Instead, the court relied upon the testimony of Milgard's expert economist, Dr. Finch, to conclude that Selas' failure to design a furnace capable of ever meeting those cycle rates would cost Milgard $252,608 in lost profits. Milgard also produced uncontroverted documentary evidence that such failure would cost it $401,878.50. For reasons expressed above, we find no error in the judge's finding.

**C**

Finally, Selas contends the district court made a computational error in arriving at the $860,497 figure. Specifically, it argues

---

**10.** Dr. Finch concluded that Milgard's losses were in excess of $1.7 million. The district court found that they were roughly $1.1 million.

**11.** The court determined only that under § 25.1 of the contract, Selas had guaranteed that it

would demonstrate that the furnace could meet those cycle rates. March 24 Oral Ruling, Transcript at 3283, 3291–92. Selas never lived up to this guarantee. *Id.* at 3294.

that the court neglected to subtract the actual profit ($591,537) Milgard earned during the 21–month "damage period."

Selas errs by inferring that the court's computation represented the *total* profit Milgard would have made during that period. Instead, the court referred to the profit Milgard *lost* during that period, over and above the $591,537 Milgard actually made. In his March 26 Oral Ruling, Judge Bryan twice called this computation one of "lost profits." Transcript at 3452. Finding 120 does not make that distinction as clearly; however, because the Oral Ruling was incorporated into the Findings of Fact and Conclusions of Law, *see* Finding 2, we believe the court referred only to profits Milgard did not realize.

Our conclusion finds further support in the district court's response to Selas' Motion to Reconsider Amount of Damages and Lost Profits. The court flatly rejected the very computational error argument now on appeal and directed both parties' attention to the fact that its Oral Rulings were incorporated into the Findings. Thus, Selas' claim of mathematical error simply does not add up.

## IV

Selas further disputes the trial court's ruling that the parties did not enter into an accord and satisfaction in March, 1982. Selas maintains that the parties reached an accord whereby Milgard limited its remedies to rescission and return of the purchase price.

 Whether there has been an accord and satisfaction is generally a mixed question of law and fact. If the facts are not controverted by the parties, the question is purely one of law for the trial court. *Kibler v. Frank L. Garrett & Sons, Inc.,* 73 Wash.2d 523, 439 P.2d 416, 419 (1968). Both questions of law and mixed questions of law and fact are reviewed de novo. *United States v. McConney,* 728 F.2d 1195, 1199–1204 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). However, essentially factual in-

quiries or the establishment of historical facts are reviewed under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). *Id.* at 1202–04.

 An accord and satisfaction consists of three elements: (1) a bona fide dispute; (2) an agreement to settle that dispute (accord); and (3) execution of that agreement (satisfaction). *Ward v. Richards & Rossano, Inc., P.S.,* 51 Wash.App. 423, 754 P.2d 120, 125, *rev. denied,* 111 Wash.2d 1019 (1988). The new agreement is interpreted according to ordinary contract principles. *See Perez v. Pappas,* 98 Wash.2d 835, 659 P.2d 475, 480 (1983). " 'The key element of accord and satisfaction is the intention of the parties, which as a rule presents a question of fact.' " *Milgard I,* 761 F.2d at 557 (quoting *Black v. Denver United States Nat. Bank,* 362 F.2d 38, 41 (8th Cir.), *cert. denied,* 385 U.S. 990, 87 S.Ct. 596, 17 L.Ed.2d 451 (1966)). The trier of fact must determine whether there was a meeting of minds as to the subject matter of the new agreement and an intention to reach a genuine compromise. *Plywood Mktg. Assoc. v. Astoria Plywood Corp.,* 16 Wash.App. 566, 558 P.2d 283, 289 (1976), *rev. denied,* 88 Wash.2d 1014 (1977); *James S. Black & Co. v. Charron,* 22 Wash.App. 11, 587 P.2d 196, 198 (1978), *rev. denied,* 91 Wash.2d 1022 (1979).

 In this case, the district judge found that there was no such meeting of the minds. In particular, he found that the agreement was incomplete in two important respects: (1) whether Milgard reserved the right to file a second lawsuit;[12] and (2) the extent of Milgard's obligations if Selas were able to operate the furnace for six months at a 90% yield rate. March 24 Oral Ruling, Transcript at 3265; Finding 10.

Selas disputes these findings, claiming that it never would have agreed to perform the work without reaching agreement on those issues. However, this argument proves only Selas' understanding of the proposed agreement. The testimony of Milgard's president, Gary Milgard, paints a

---

12. Milgard had dismissed its first complaint without prejudice.

different picture. For example, his understanding of his firm's obligations to Selas after the six-month period was that

> our [Milgard's] options were still open to us. We could at the end of the six-month period determine that we were just going to go through this cycle and that we would have to get rid of [the furnace] or we could keep it or we could—and we could—and under either condition, we were still going to go after those damages for expenses.

Transcript at 1327–28. The district court credited this testimony. Determinations of credibility are not lightly upset on appeal. *See S.E.C. v. Rogers*, 790 F.2d 1450, 1455 (9th Cir.1986). Because Selas provides no reason to disbelieve Mr. Milgard's testimony, we agree with the district court that there was an incomplete meeting of the minds and therefore no accord.

## V

Selas next contends that the district judge erred by failing to perceive its arguments at trial as affirmative defenses under the contract. The court ruled that none of the defenses absolved Selas of liability, but did consider some of Selas' evidence in calculating damages.[13] The court couched its rulings in terms of causation—indicative, Selas now contends, that the court regarded Selas' arguments as either tort defenses or mere factors in mitigating damages.

We disagree. The court simply responded to the language in Selas' Affirmative Defenses.[14] The court found none of the particular arguments in support of these affirmative defenses sufficient to relieve Selas from liability. It explained: "The sum total of all these defenses is that none of them individually or collectively prevented this equipment from living up to the requirements of the contract, but those various things, individually and collectively, may well have added to Milgard's loss during the damage period." March 24 Oral Ruling, Transcript at 3301. Thus, Selas' argument that the court strayed into the field of tort law is frivolous.

## VI

Analysis of Selas' claim of judicial impropriety warrants further explication of the facts surrounding the bench trial. For most of the litigation on remand, Judge Bryan relied upon one of his law clerks, Ms. Patricia Schafer, for assistance in legal research. In early March, 1987, Judge Bryan mentioned to Milgard's and Selas' counsel that Ms. Schafer's tenure in his chambers was drawing to a close. Shortly thereafter, a member of Milgard's counsel's law firm contacted Ms. Schafer regarding her availability for employment. Ms. Schafer reported the contact to Judge Bryan, who immediately withdrew her from the case. Thereafter, Ms. Schafer had no communication with the judge regarding the Milgard case.

Subsequently, on March 18, 1987, Ms. Schafer had her first interview with the law firm representing Milgard. On March 24 and 26, Judge Bryan delivered his Oral Rulings. On April 1, 1987, Ms. Schafer received an offer of employment from Mil-

---

**13.** In its March 24 Oral Ruling, the district court addressed Selas' defenses seriatim: (1) Milgard's failure to install a roof over the furnace; (2) failure to provide a level floor; (3) failure to provide Selas adequate access to the furnace equipment to execute repairs; (4) failure to supply a clean power line; (5) failure to provide adequate training to Milgard employees operating the furnace; (6) failure to hire skilled tempering operators; (7) unauthorized modifications of the furnace; (8) improper maintenance; (9) inadequate operation of the glass tempering operation. Transcript at 3295–3300.

**14.** Specifically, Selas' Answer contained the following:

> *Third Affirmative Defense*
> The contract further expressly provides that in no event will defendant be liable for damages *resulting from* the nonoperation of plaintiff's plant, loss of product, raw materials or production *as a result of the use, misuse or inability to use* the equipment covered by the contract....
> ....
> *Fifth Affirmative Defense*
> Any and all damages alleged to have been suffered by plaintiff in connection with the equipment purchased under the contract were *proximately caused by plaintiff's own negligence and misuse of the equipment.*
> Answer 4–5 (emphasis added).

gard's counsel's firm. On May 20, Selas moved for a new trial and judge, alleging that the timing of Ms. Schafer's employment negotiations created an impression of judicial impropriety requiring Judge Bryan to recuse himself from the case. The court denied the motion June 17, 1987 and entered judgment the following day. Selas maintains on appeal that recusal was necessary under these circumstances.

■ Federal judges are required by statute to recuse themselves from any proceeding in which their impartiality might reasonably be questioned. 28 U.S.C. § 455(a) (1988). Section 455(a) governs circumstances that appear to create a conflict of interest, even where none really exists. *Davis v. Xerox*, 811 F.2d 1293, 1295 (9th Cir.), *cert. denied*, 484 U.S. 966, 108 S.Ct. 457, 98 L.Ed.2d 397 (1987).

■ This circuit has determined that the test for recusal is " 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.' " *Herrington v. Sonoma Cty.*, 834 F.2d 1488, 1503 (9th Cir.1987) (quoting *United States v. Nelson*, 718 F.2d 315, 321 (9th Cir.1983)), *cert. denied*, — U.S. —, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989). A judge's decision not to recuse himself is reviewed for an abuse of discretion. *United States v. Hamilton*, 792 F.2d 837, 839 (9th Cir.1986).

■ This circuit has never addressed the question of whether law clerk employment negotiations may give rise to a reasonable impression of judicial impropriety. In denying Selas' motion for a new trial and new judge, the district court relied upon *Hunt v. American Bank & Trust Co.*, 783 F.2d 1011 (11th Cir.1986) (per curiam). In *Hunt*, the Eleventh Circuit held that § 455(a) did not require recusal of a judge whose two law clerks accepted employment offers from the law firm representing several of the defendants in a pending trial, because neither of the clerks worked on the case in question. The court explained:

If a clerk has a possible conflict of interest it is the clerk, not the judge, who must be disqualified. We do not believe that a law clerk's acceptance of future employment with a law firm would cause a reasonable person to doubt the judge's impartiality so long as the clerk refrains from participating in cases involving the firm in question.

783 F.2d at 1016.

We find this reasoning persuasive. Indeed, this circuit has already embraced this view implicitly by distributing to its law clerks, *A. Rubin & L. Bartell, Law Clerk Handbook* (Federal Judicial Center rev. ed. 1989), which states: "When a clerk has accepted a position with an attorney or with a firm, that clerk should cease further involvement in those cases in which the future employer has an interest." *Id.* § 2, at 23.

Our position is not inconsistent with the decision on which Selas relies, *Hall v. Small Business Admin.*, 695 F.2d 175 (5th Cir.1983). There the Fifth Circuit determined that a clerk's *continued participation* in a case in which her future employers were counsel gave rise to an appearance of partiality. The court reasoned: "Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision." *Id.* at 179. We agree. But when the judge promptly removes the clerk from the case, and avoids further communication with that clerk about the litigation, the appearance of judicial propriety is preserved. To rule otherwise would enable litigants to sabotage trials by telephoning or mailing employment offers to law clerks.

The facts of this case do not indicate that the trial judge abused his discretion in refusing a new trial. Immediately after Ms. Schafer was contacted by counsel for Milgard, Judge Bryan removed her from the case and notified counsel of that fact. Thereafter, he completely sealed her off from the Milgard litigation.[15] It is clear

15. Selas disputes the date of Schafer's removal in light of two subsequent letters to counsel, upon which her initials "PKS" appear in typeface. However, we are convinced that this was

that the judge did everything he could to preserve the impartiality of the court, both in fact and appearance. Thus, his denial of Selas' motion was not an abuse of discretion.[16]

## VII

Milgard's cross-appeal concerns the district court's decision not to award it attorney's fees as the prevailing party. Specifically, the court declined to interpret § 28.1(f) of the contract as awarding attorney's fees to the prevailing party in any litigation concerning the glass furnace.[17] Previously, Judge Tanner, after granting summary judgment in favor of Selas, awarded it attorney's fees as the prevailing party. This court vacated that award on appeal pending the outcome of the trial on remand. *See Milgard I,* 761 F.2d at 558.

Milgard bases its cross-appeal on two theories. First, it claims that the Judge Tanner's award to Selas as prevailing party and our decision in *Milgard I* constitute the law of the case, thereby precluding Judge Bryan from reconsidering the issue of attorney's fees. Second, it contends that Selas is judicially estopped from contradicting its earlier position that the contract provides attorney's fees for the prevailing party.

### A

 The law of the case doctrine is a judicial invention designed to aid in the efficient operation of court affairs. *Lockert v. United States Dept. of Labor,* 867 F.2d 513, 518 (9th Cir.1989). Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case. *Richardson v. United States,* 841 F.2d 993, 996 (9th Cir.), *amended,* 860 F.2d 357 (9th Cir.1988). For

the doctrine to apply, the issue in question must have been "decided explicitly or by necessary implication in [the] previous disposition." *Liberty Mutual Ins. Co. v. E.E. O.C.,* 691 F.2d 438, 441 (9th Cir.1982). *Accord Eichman v. Fotomat Corp.,* 880 F.2d 149, 157 (9th Cir.1989). A significant corollary to the doctrine is that dicta have no preclusive effect. *Ducey v. United States,* 830 F.2d 1071, 1072 (9th Cir.1987).

 Application of the doctrine is discretionary. *United States v. Mills,* 810 F.2d 907, 909 (9th Cir.), *cert. denied,* 484 U.S. 832, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987). Accordingly, we review a trial judge's decision to depart from the principle of finality for an abuse of discretion. *Pyramid Lake Tribe v. Hodel,* 882 F.2d 364, 369 n. 5 (9th Cir.1989). A court properly exercises its discretion to reconsider an issue previously decided in only three instances: (1) the first decision was clearly erroneous and would result in manifest injustice; (2) an intervening change in the law has occurred; or (3) the evidence on remand was substantially different. *Eichman,* 880 F.2d at 157.

 We find the law of the case doctrine inapplicable to the issue of attorney's fees in this case. Neither Judge Tanner at summary judgment nor this court in *Milgard I* specifically addressed the issue of whether § 28.1(f) of the contract provided for attorney's fees for any prevailing party. After granting summary judgment for Selas, the issue before Judge Tanner was whether that contractual provision would award fees to Selas' counsel. He held that "pursuant to § 28.1(f) of the purchase contract and Wash.Rev.Code 4.84.330, [Selas] being the prevailing party herein, is entitled to reasonable attorney's fees and costs." Milgard tries to stretch this statement into a broad holding that § 28.1(f)

---

a scrivener's error caused by careless use of a prior letterhead stored in computer memory from November 6, 1986.

**16.** We therefore do not address the district court's alternative ground for denying the motion for new trial: that Selas' motion was not timely filed in accordance with 28 U.S.C. § 144 (1988).

**17.** Section 28.1(f) of the contract provides that:
Purchaser [Milgard] will pay all expenses (including the reasonable fees and expenses of legal counsel for Selas) in connection with the enforcement of Selas' rights as a secured party hereunder.

awards attorney's fees to any prevailing party in litigation over anything related to the furnace.

However, because that broader issue was not necessary to Judge Tanner's determination, any general remarks he may have made about the "prevailing party" are dicta. *See* Black's Law Dictionary 409 (West 5th ed. 1979). Of course, the law of the case doctrine gives no preclusive effect to dicta. *Ducey v. U.S.*, 830 F.2d 1071, 1072 (9th Cir.1987).

In a similar vein, our decision in *Milgard I* did not trigger the doctrine. There, we expressly stated that the issue of attorney's fees was not before us. 761 F.2d at 558. Although we did vacate Judge Tanner's award for determination of the "prevailing party" after trial, *see id.*, we were not resolving the issue, but merely echoing Judge Tanner. In fact, we recognized that the district court's award was based upon a contractual provision dealing with the enforcement of *Selas' rights as a secured party. See id.* at 557. Thus, our use of the phrase "prevailing party" also did not establish the law of the case.

### B

Milgard next argues that Selas was judicially estopped from arguing before Judge Bryan on remand (and remains so before this court) that § 28.1(f) does not award attorney's fees to the prevailing party in litigation to enforce any provision of the contract.

■ This circuit has recognized that the doctrine of judicial estoppel precludes parties from taking inconsistent positions in the same litigation but has yet to state the requirements for the doctrine's application. *Stevens Tech. Serv. v. SS Brooklyn*, 885 F.2d 584, 589 (9th Cir.1989). The majority view is that the doctrine is inapplicable unless the inconsistent assertion was actually adopted by the court in the prior litigation. *Id.* at 588 (citing *Allen v. Zurich Ins.*

*Co.*, 667 F.2d 1162, 1167 (4th Cir.1981); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.1982); *United States v. 49.01 Acres of Land*, 802 F.2d 387, 390 (10th Cir.1986)). *See also Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir.1980); *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir.1953). This view recognizes that absent judicial adoption of the prior position, there is no risk of inconsistent results. *Stevens*, 885 F.2d at 588.

The minority view is more broad, extending judicial estoppel in all cases where the offending party has played "fast and loose" with the court, even if ultimately unsuccessful. *See, e.g., Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir.1987).

■ In this case it is unnecessary to decide which view to adopt. Assuming arguendo that Selas has taken inconsistent positions,[18] judicial estoppel does not apply under either the majority or minority views. Under the majority view, estoppel is improper because, as stated above, Judge Tanner did not hold that § 28.1(f) applied to both parties.

Under the minority view, estoppel is unwarranted because Selas' conduct cannot be deemed "fast and loose." *Patriot Cinemas* involved the plaintiff's repudiation of its prior representation that it would not prosecute the state antitrust count in its complaint. The First Circuit found this impermissibly "fast and loose" because "'intentional self-contradiction [was] being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" 834 F.2d at 212 (quoting *Scarano*, 203 F.2d at 513).

We do not have such calculated scheming in this case. Ironically, Milgard has changed *its* position on whether Selas' change in position was an impermissible ploy. Initially, Milgard's counsel conceded to Judge Bryan that Selas' change of position was permissible:

**18.** This assumption is hardly unrealistic. In its Memorandum in Support of Attorney Fees in the case before Judge Tanner, Selas stated: "[I]t is obvious that both parties to this contract clearly and explicitly intended that Section 28.-

> 1(f) to allow a recovery of attorney's fees, costs, and expenses in connection with the enforcement of *either* party's rights under this contract and applicable law." (Emphasis in original).

THE COURT: What's the matter with [Selas' counsel] changing their position at this point?

MR. PETERSON: I don't think there's anything wrong with changing their position. It seems to me that they are a little late in doing it is all. After the representations to the original trial court and the representations to the [*Milgard I*] court, I don't think it's timely, but I'm not going to say they couldn't do it.

Transcript at 3348.

We are inclined to accept Milgard's previous, more spontaneous characterization—that Selas' change was a little late, perhaps a little self-serving, but hardly the outright attempt to abuse an impartial forum *i.e.,* the "fast and loose" behavior proscribed by *Patriot Cinemas.* Thus, Milgard's second argument fails as well.

## VIII

For these reasons, the judgment of the district court is AFFIRMED.